IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

KRISTINA M. DENTON,           )
                              )
          Plaintiff,          )
                              )
v.                            )   CIVIL ACTION NO. 16-0423-MU
                              )
NANCY A. BERRYHILL,           )
Acting Commissioner of Social )
Security,[1]                  )
                              )
          Defendant.          )

## MEMORANDUM OPINION AND ORDER

Plaintiff Kristina M. Denton brings this action, pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3), seeking judicial review of a final decision of the

Commissioner of Social Security ("the Commissioner") denying her claim for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the

Act") and for Supplemental Security Income ("SSI"), based on disability, under

Title XVI of the Act. The parties have consented to the exercise of jurisdiction by

the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this

Court. (Doc. 24 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.

R. Civ. P. 73, the parties in this case consent to have a United States Magistrate

Judge conduct any and all proceedings in this case, … order the entry of a final

judgment, and conduct all post-judgment proceedings.")) (*See also* Doc. 25).

Upon consideration of the administrative record, Denton's brief, the

_____
[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on
January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure
and 42 U.S.C. § 405(g), Nancy A. Berryhill is substituted for former Acting
Commissioner Carolyn W. Colvin as the defendant in this action.

Commissioner's brief, and oral argument presented at the August 15, 2017 hearing before the undersigned Magistrate Judge, it is determined that the Commissioner's decision denying benefits should be affirmed.[2]

## I.  PROCEDURAL HISTORY

Denton applied for DIB, under Title II of the Act, 42 U.S.C. §§ 423 - 425, and for SSI, based on disability, under Title XVI of the Act, 42 U.S.C. §§ 1381-1383d, on August 19, 2013, alleging disability beginning on May 1, 2012. (Tr.165-69, 170-75). Her application was denied at the initial level of administrative review on October 7, 2013. (Tr. 87-92). On October 24, 2013, Denton requested a hearing by an Administrative Law Judge (ALJ). (Tr. 103-04). After a hearing was held on December 10, 2014, the ALJ issued an unfavorable decision finding that Denton was not under a disability from the date the application was filed through the date of the decision, February 23, 2015. (Tr.18-29). Denton appealed the ALJ's decision to the Appeals Council, and, on June 29, 2016, the Appeals Council denied her request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3, 9).

After exhausting her administrative remedies, Denton sought judicial review in this Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Doc. 1). The Commissioner filed an answer and the social security transcript on November 7,

---

[2] Any appeal taken from this Order and Judgment shall be made to the Eleventh Circuit Court of Appeals. *See* Doc. 24. ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for the judicial circuit in the same manner as an appeal from any other judgment of this district court.").

2016. (Docs. 11, 12). Both parties filed briefs setting forth their respective positions. (Docs. 13, 21). Oral argument was held before the undersigned Magistrate Judge on August 15, 2017. The case is now ripe for decision.

## II.  CLAIMS ON APPEAL

Denton alleges that the ALJ's decision to deny her benefits is in error for the following reasons:

1. The ALJ erroneously concluded that Denton's ankle strain and right middle trigger finger were not severe impairments;

2. The ALJ erred in finding that the Commissioner proved that there is other work in significant numbers in the national economy that Denton can perform given the assigned residual functional capacity (RFC); and

3.  The ALJ erroneously relied upon a non-examining reviewing physician's opinion to support the RFC assigned to Denton.

(Doc. 13 at p. 2).

## III. BACKGROUND FACTS

Denton was born on September 4, 1981, and was almost 32 years old at the time she filed her claim for benefits. (Tr. 165). Denton alleged disability due to right shoulder bursitis, right wrist tendonitis, bursitis of the hips, bilateral ankle strain, trigger finger on her right middle finger, fibromyalgia, GERD, bipolar disorder, and personality disorder. (Tr. 20-21). She graduated from high school and took courses towards an associate's degree. (Tr. 40). She worked as a petroleum supply specialist in the fuel and aviation unit when she was in the military from 2005 until 2009. (Tr. 40). In addition to that work, she has worked as

a server, cook, and manager at various restaurants. (Tr. 40-41). Denton last

worked on May 1, 2012. (Tr. 40). Denton testified that she has good days and

bad days. On her good days, Denton engages in normal life activities; such as,

handling her personal care, taking care of her five-year old twins, cleaning her

house, baking, running errands, socializing with family, taking her twins to the

park or other activities, and practicing ball with her twins.  (Tr. 47).  On her bad

days, she has to have help with her children and cannot do all of these activities.

(Tr. 41, 48). After conducting a hearing, the ALJ made a determination that

Denton had not been under a disability during the relevant time period, and thus,

was not entitled to benefits. (Tr.16-41).

## IV. ALJ'S DECISION

After considering all of the evidence, the ALJ made the following findings

that are relevant to the issues presented in his March 23, 2015 decision:

> **3.     The claimant has the following severe impairments: bipolar
> disorder; personality disorder; fibromyalgia; right shoulder bursitis;
> right wrist tendonitis; and bursitis of the hips (20 CFR 404.1520(c)
> and 416.920(c)).**
>
> These impairments are established by the material evidence, which will
> be discussed in more detail below, and impose more than minimal
> limitations on the claimant's ability to perform basic work-related
> activities. Therefore, these impairments are considered to be severe
> within the meaning of the Regulations.
>
> The claimant also has the following non-severe impairments, which
> when considered singly and in combination, do not cause more than a
> minimal limitation in the ability to perform basic work activity: right
> middle trigger finger; history of bilateral ankle injuries; and
> gastroesophogeal reflux disease (GERD).
>
> At the hearing, the claimant testified that the Department of Veterans
> Affairs (VA) was referring her for treatment for trigger finger on her right
> middle finger. Records also show that she was given a splint. (Exhibit

3F, page 33) However, x-rays taken in November 2012 are negative, and the record does not show ongoing complaints related to this condition. (Exhibit 3F, page 10) Therefore, the claimant's alleged trigger finger does not affect her ability to perform basic work activity and is non-severe.

The claimant also testified to a 10% VA disability rating for both of her ankles secondary to stress fractures. In August 2013, the claimant underwent a Compensation and Pension (C&P) Examination at the VA Medical Center in Birmingham. Examination findings were grossly normal, and x-rays were unremarkable. The report shows a diagnosis of ankle strain and concludes that her ankle condition does not impact her ability to work. (Exhibit 3F, page 2, 44-51) Therefore, the claimant's alleged bilateral ankle impairments are non-severe.

Records also show that the claimant has been diagnosed with GERD. Nevertheless, the record does not show any ongoing treatment for this condition and the August 2013 C&P evaluation finds that this impairment does not have any impact on the claimant's ability to work. (Exhibit 3F, page 40-44) Accordingly, the undersigned finds the claimant's GERD non-severe.

* * *

**5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. She should not work at unprotected heights, around hazardous machinery, or operate automotive equipment and should never climb ladders, ropes, or scaffolds. She should never reach overhead with the right upper extremity, but can occasionally push/pull arm controls with the right upper extremity and can occasionally handle with the dominant right hand. The claimant is able to understand and carry out detailed, but uninvolved, written or oral instructions involving a few concrete variables in or from standardized situations. She can tolerate occasional contact with the general public and can occasionally adapt to minimal changes in the work setting or routine. She is able to maintain attention and concentration for up to two hours at a time and can perform goal oriented work, rather than production pace work.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

* * *

At the hearing, the claimant testified to ongoing right shoulder and wrist pain. She reported that physical therapy has been recommended for her shoulder, and that she must use her left non-dominant hand to lift a gallon of milk. She also testified that she has difficulty grasping the steering wheel or holding a video game controller. Regarding her recent diagnosis with fibromyalgia, the claimant testified to having good days and bad days. She states that on a bad day, she is bedridden and needs her neighbors to help care for her children. She reports taking multiple medications to control her pain. Otherwise, the claimant alleges disability due to bipolar disorder, and testified to manic episodes and panic attacks.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

In terms of the claimant's alleged right shoulder pain, a May 2013 MRI shows mild subacromial- subdeltoid bursal complex fluid, with a clinical correlation for bursitis, and mild cuff tendinosis. At the August 2013 C&P examination, the claimant reported chronic shoulder pain and limited range of motion. Examination findings revealed tenderness to palpation and guarding with decreased strength of 4/5 on abduction and forward flexion. Furthermore, the claimant's posterior shoulder joint musculature showed some localized atrophy with slight downsloping. Accordingly, the VA concluded that the claimant should be limited to no heavy lifting. (Exhibit 3F, page 3, 59-68)

The claimant has also been diagnosed with tendonitis in the right wrist. The August 2013 C&P examination showed some

crepitations, but findings were otherwise mild. The claimant demonstrated 4/5 strength and a full range of motion with pain noted only at 60 degrees of dorsiflextion. Diagnostic imaging of the claimant's wrist was also unremarkable. Based on these findings, the VA found that the claimant's wrist condition does not impact her ability to work. (Exhibit 3F, page 3, 69-74)

The undersigned accounts for the claimant's shoulder pain and wrist tendonitis with a residual functional capacity for a reduced range of light work, lifting no more than 20 pounds. Furthermore, in giving full credit to the claimant's complaints of pain, she should not lift overhead on the right, should only occasionally push/pull with the right upper extremity, and only occasionally handle with the dominant right hand. However, greater limitations are not warranted as examination findings are for the most part mild. Furthermore, the VA did not assess any limitations on the claimant's functioning beyond restrictions on heavy lifting.

Regarding the claimant's bilateral hip pain, records show a diagnosis of bursitis on the right. The August 2013 C&P examination revealed localized tenderness and pain to palpation of the right hip and some pain with range of motion. However, otherwise, the claimant showed full strength on flexion, abduction, and extension, and November 2012 x-rays were negative. Accordingly, the VA found that the claimant's hip condition does not impact her ability to work. (Exhibit 3F, page 5, 52-59) Nevertheless, in viewing the evidence in a light most beneficial to the claimant, the undersigned limits her to only occasional postural activities to account for any pain that may be caused by her hips. Again, greater limitations are not warranted based on mild objective findings and the VA's assessment of no limitations secondary to her hip impairment.

Following the claimant's August 2013 evaluation, she did not return to the VA medical center with complaints of joint pain until April 2014. At that time, examination revealed 16 of 18 tender trigger points, and accordingly, she was diagnosed with chronic pain, which appeared to be fibromyalgia. (Exhibit 6F) Treatment was conservative through a trial of gabapentin, and she was not referred for specialized treatment. Thereafter, the record does not show any further complaints related to fibromyalgia, aside from an initial consultation at the VA medical center in Mobile in July 2014, after the claimant moved. (Exhibit

8F)

The undersigned finds a residual functional capacity for a reduced range of light work is sufficient to address the claimant's positive trigger points. Otherwise, the undersigned limits the claimant to simple, unskilled, goal oriented work to accommodate any distraction the claimant may experience secondary to pain. Otherwise, the residual functional capacity includes limitations on climbing, heights, driving, and hazardous machinery to account for medication side effects.

Regarding the claimant's mental impairments, in March 2013, the claimant initiated bi-weekly outpatient mental health treatment at the VA Medical Center in Birmingham. Initially, she showed significant psychological distress with generally low GAF scores ranging from 45-52. (Exhibit 3F, page 27-31, 223-236) However, by June 2013, she reported feeling much better with a stabilized mood.

Thereafter, progress notes generally indicate only moderate distress, and she typically presented fully oriented with a friendly demeanor. Mental status examination findings were also generally within normal limits showing good attention and concentration, intact memory, and normal thought content. (Exhibit 3F, page 1S7-178)

Although records show ongoing reports of mood swings, stress, irritability, and panic attacks, the claimant's complaints are typically attributable to outside stressors such as caring for her children, her applications for disability benefits, or the deaths of loved ones. (Exhibit 4F, 5F, 8F) In February 2014, the claimant requested to decrease the frequency of her sessions to once per month, and her psychologist agreed due to her "stability." (Exhibit 5F, page 17)

The undersigned has accounted for the claimant's manic episodes and panic attacks with limitations to unskilled work and only occasional contact with the public. This degree of limitation is consistent with updated GAF scores ranging from 55-62. (Exhibit 3F, 147-1S8, 4F, 5F, 6F) To the extent these scores constitute an opinion, they are given some weight, as they indicate mild to moderate symptoms, which is consistent with the findings on mental status examination, discussed above.

Otherwise, the undersigned assigns little weight to the claimant's GAF of 50 during her 2009 hospitalization and scores ranging from 45-52 in the period immediately after she initiated psychological treatment. (Exhibit 1F, 3F, page 184-236) These low scores were given before the alleged onset date or in the months after she initiated professional mental health treatment.

Furthermore, the record shows an improvement of the claimant's condition through treatment. Because GAF scores offer only a mere snapshot of the claimant's functioning at the time of the exam, these scores are not indicative of the claimant's overall level of functioning throughout the period at issue.

As for the opinion evidence, the undersigned assigns great weight to the October 2013 opinion from Dr. Estock, which finds the claimant able to understand and remember simple instructions, but not detailed ones; carry out simple instructions and sustain attention to routine tasks for extended periods; tolerate ordinary work pressures, but should avoid quick decision making, rapid changes, and multiple demands; would benefit from regular rest breaks and a slowed pace, but will still be able to maintain a work pace consistent with the mental demands of competitive level work; contact with the public should be casual; feedback should be supportive; and the claimant can adapt to infrequent, well explained changes. (Exhibit 3A, 4A) These limitations are for the most part consistent with the medical evidence of record as a whole, discussed in greater detail above. Although the claimant has a history of mood swings and panic attacks, her presentation and performance on mental status exam are typically within normal limits, and treatment has been routine and conservative.

Dr. Estock limited the claimant to simple, but not detailed, instructions; however, the undersigned finds the claimant able to understand and carry out detailed but uninvolved instructions. Despite reports of mood swings and manic episodes, examination findings reflecting [sic] normal attention and concentration. The undersigned finds Dr. Estock's opinion that the claimant is able to sustain attention for extended periods and is able to maintain a work pace consistent with the mental demands of competitive level work consistent with the

ability to maintain attention and concentration for up to two hours at a time. Otherwise, the limitation to occasional contact with the general public accounts for the claimant's history of panic attacks, and goal oriented, as opposed to production pace work, accounts for any difficulty the claimant may have tolerating work pressures and Dr. Estock's finding that she should avoid rapid changes and multiple demands and would benefit from a slowed pace.

The VA also evaluated the claimant's mental impairments in August 2013. She was assessed with a mood disorder, not otherwise specified and a GAF of 62. Based on an in-person examination and review of records, the report concludes that the claimant has an occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily with normal routine behavior, self-care, and conversation. Furthermore, cluster B features likely impact the claimant's ability to cope with stress and manage emotions, which leaves her more vulnerable to develop psychological difficulties during times of stress. (Exhibit 3F, page 86-88, 147-149)

The undersigned also assigns great weight to this opinion, as it is also consistent with a significant reduction in skill and interaction. Furthermore, to account for cluster B features, which impact the claimant's ability to handle stress, the claimant should only occasionally adapt to minimal changes in the work setting. This restriction is also consistent with Dr. Estock's finding that the claimant should be able to adapt to infrequent, well explained changes.

Greater mental limitations are not warranted based on the medical evidence of record as a whole. As noted above, the claimant's level of care is not what would be expected of someone with the degree of impairment alleged. After initiating routine mental health treatment in March 2013, her mood disorder was controlled conservatively with medication, and by February 2014, her treating psychologist agreed to decrease the frequency of her counseling from bi-weekly to monthly due to her stability. Otherwise, the claimant's activities of daily living are not consistent with a disabling mental impairment. She is the custodial parent for her five year old twins, one of which has special needs. She is independent in self-care, able to wash dishes, do laundry, clean the tub and take her children to the park and to play baseball.

Otherwise, the undersigned also assigns great weight to the August 2013 C&P examination findings, which are consistent with a residual functional capacity for a reduced range of light work. As noted above, the examination concluded that the claimant's right shoulder bursitis limits her to no heavy lifting, however her remaining alleged impairments, such as right hip bursitis and right hand tendonitis, do not limit her ability to work. Nevertheless, the undersigned has considered the pain caused by these conditions in assessing postural and hazard limitations as well as limitations on using the right upper extremity. (Exhibit 3F, page 38-74)

Finally, the undersigned has considered a third party function report submitted by the claimant's roommate. (Exhibit 5A) Although he is not an acceptable medical source, his report must be considered per Social Security Ruling 06-03p to show the severity of the claimant's impairments and how they affect her ability to function. The undersigned gives this statement some weight, as it is generally consistent with the claimant's reporting of her own daily activities, and shows that the claimant is independent in self-care, able to interact appropriately with others, and has adequate focus to read, crochet, and manage her own finances.

* * *

**10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CPR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as sandwich board carrier (DOT 299.687-014), which is light with an SVP 1 with 100,000 jobs in the national economy; school crossing guard (DOT 371.567-010), which is light with an SVP 2 with 100,000 jobs in the national economy; and school bus monitor (DOT 372.667-042), which is light with an SVP 2 with 80,000 jobs in the national economy.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(Tr. 20-21, 23-28).

## V. DISCUSSION

Eligibility for DIB and SSI benefits requires that the claimant be disabled. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1)-(2). A claimant is disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of

not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The

impairment must be severe, making the claimant unable to do the claimant's

previous work or any other substantial gainful activity that exists in the national

economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-11. "Substantial gainful

activity means work that … [i]nvolves doing significant and productive physical or

mental duties [that] [i]s done (or intended) for pay or profit." 20 C.F.R. §

404.1510.

     In all Social Security cases, an ALJ utilizes a five-step sequential

evaluation in determining whether the claimant is disabled:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if
> not, whether the claimant has a severe impairment; (3) if so, whether the
> severe impairment meets or equals an impairment in the Listing of
> Impairment in the regulations; (4) if not, whether the claimant has the RFC
> to perform her past relevant work; and (5) if not, whether, in light of the
> claimant's RFC, age, education and work experience, there are other jobs
> the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.,* 457 F. App'x 868, 870 (11th Cir. 2012) (per

curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips*

*v. Barnhart,* 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The

claimant bears the burden of proving the first four steps, and if the claimant does

so, the burden shifts to the Commissioner to prove the fifth step. *Jones v. Apfel*,

190 F.3d 1224, 1228 (11th Cir. 1999).

     If the claimant appeals an unfavorable ALJ decision, the reviewing court

must determine whether the Commissioner's decision to deny benefits was

"supported by substantial evidence and based on proper legal standards."

*Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011) (citations

omitted); *see* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel*, 631 F.3d at 1178 (citations omitted). "In determining whether substantial evidence exists, [the reviewing court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The reviewing court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Id*. When a decision is supported by substantial evidence, the reviewing court must affirm "[e]ven if [the court] find[s] that the evidence preponderates against the Secretary's decision." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

As set forth above, Denton has asserted three grounds in support of her argument that the Commissioner's decision to deny her benefits is in error. The Court will address Denton's contentions in the order in which they correspond to the sequential evaluation process.

## A.  ALJ's Findings Regarding Ankle Strain and Trigger Finger

Denton asserts that the ALJ's determination that her bilateral ankle strain and right middle trigger finger are non-severe impairments was in error because it is not supported by substantial evidence. She argues that the pain caused by these conditions impairs her ability to retain gainful employment. (Doc. 13 at p. 4).

With regard to the trigger finger condition, the medical records cited by Denton to support her argument show that she was seen in the Emergency Department at the VA on November 4, 2012 complaining of a cough, a facial rash, and joint pain. (Tr. 579). With regard to the joint pain, she reported diffuse joint pain notably in her bilateral wrists and at the PIP on the right middle finger for the preceding 2-3 days. (Tr. 579-80). Examination of the finger revealed full range of motion and that strength and sensation were intact, but the tendon did appear to make a popping sensation when she went from extreme flexion to extension. (Tr. 580). No treatment was given, and she was advised to follow-up with her primary treating physician. (Tr. 581). She was seen at the VA clinic on November 5, 2012 and, although her primary complaint seemed to be the facial rash, she also reported that she had increasing pain in her fingers during the preceding week. (Tr. 566). The records do not reflect any treatment being given for her finger pain on that visit. (Tr. 566-67). Denton went to the clinic again on February 8, 2013, complaining of painful contracture of her right middle finger that was too painful for her to release. (Tr. 532). She reported that she had been experiencing painful contractures of her right hand and particularly the middle finger for about one year but had always been able to stretch it back out and get relief in the past. The doctor was able to release the finger manually, but it was painful. (*Id*.). The record reflects that x-rays of the hand taken in November of 2012 were normal. (*Id*.). She was given a trigger finger splint and a hand consult was placed. (Tr. 533). There are no records that reflect that she subsequently had a hand consult. When she moved from Birmingham to Mobile, she appeared

at the VA clinic for a new patient visit on May 23, 2014, at which time she reported, *inter alia*, that her right middle finger "locks up." (Tr. 746). There are no other records reflecting complaints concerning or treatment for her right middle trigger finger.

With regard to her allegations of ankle pain, the record reflects that during a Compensation and Pension exam at the VA on August 15, 2013, Denton reported that she had previously had a stress fracture in her right ankle, that she had multiple episodes of rolling both ankles while in the military, that she had some limited range of motion of the right ankle, and that she had chronic pain in both ankles, which was more painful with prolonged standing. (Tr. 336). She did not report that flare-ups impacted the function of the ankle. (*Id.*). Examination of both ankles revealed normal range of motion, with no objective evidence of painful motion with full flexion of both ankles and objective evidence only at the point of full extension on both ankles. (Tr. 336-37). The medical note reflected that Denton had no functional loss or impairment of either ankle, but did have localized tenderness or pain on palpation of the joints/soft tissue of both ankles. (Tr. 338). Strength was 5/5 on both ankles, and there was no laxity in either ankle. (*Id.*). The records also reflect that while Denton reported that she had a prior stress fracture of the right ankle, records indicated that a bone scan taken in October of 2005 revealed a possible stress fracture in the left foot and a stress reaction in both tibias. (Tr. 339). Bilateral ankle x-rays revealed no acute fractures or dislocation, ankle mortise (joint) is intact with no significant degenerative changes noted, no bony erosions, and soft tissues were

unremarkable. The only abnormal finding on x-ray was minimal posterior calcaneal enthesopathy (inflammation where ligaments or tendons attach to bone) bilaterally. (Tr. 340-41). The examiner concluded that Denton's ankle condition did not impact her ability to work. (Tr. 341). There was no other evidence in the record that reflected any complaints of or treatment for ankle pain.

A "severe" impairment is one that significantly limits the ability to perform basic work activities. *See* 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 416.921. The plaintiff bears the burden of proving that an impairment significantly limits the ability to do basic work skills. *See Gibbs v. Barnhart,* 156 F. App'x 243, 246 (11th Cir. 2005). Denton did not present any evidence that her right middle trigger finger impairment or her ankle impairment interfered with her ability to do basic work activities or that she continuously sought treatment for these physical impairments. *See id.* at 247. The ALJ specifically considered the medical evidence concerning these impairments and concluded that they did not constitute severe impairments. The Court finds that the ALJ's determination that Denton's sporadic reports of right middle trigger finger and bilateral ankle sprains do not constitute severe impairments is supported by substantial evidence and was not in error.

**B.  ALJ's Reliance on Dr. Estock's Opinion to Support the Assigned RFC**

The ultimate responsibility for determining a claimant's RFC, in light of the evidence presented, is reserved to the ALJ, not to the claimant's physicians or other experts. *See* 20 C.F.R. § 404.1546; *see also Green v. Soc. Sec. Admin.,*

223 F. App'x 915, 923 (11th Cir. 2007) (holding that "the ALJ will evaluate a [physician's] statement [concerning a claimant's capabilities] in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ); *Pritchett v. Colvin*, Civ. A. No. 12-0768-M, 2013 WL 3894960, at *5 (S.D. Ala. July 29, 2013) (holding that "the ALJ is responsible for determining a claimant's RFC"). Denton claims that the ALJ here erred by relying on the opinion of Dr. Robert Estock, the State agency reviewing physician who did not examine Denton, in assigning her RFC. Denton seems to base her argument on an implied assertion that the ALJ only relied on Estock's opinion in making her assessment of Denton's mental RFC. Denton's argument fails both legally and factually.

The ALJ reviewed and discussed Denton's mental examinations at the VA from the time she first sought treatment for bipolar disorder and panic attacks following her alleged onset date:

> Regarding the claimant's mental impairments, in March 2013, the claimant initiated bi-weekly outpatient mental health treatment at the VA Medical Center in Birmingham. Initially, she showed significant psychological distress with generally low GAF scores ranging from 45-52. (Exhibit 3F, page 27-31, 223-236) However, by June 2013, she reported feeling much better with a stabilized mood.
>
> Thereafter, progress notes generally indicate only moderate distress, and she typically presented fully oriented with a friendly demeanor. Mental status examination findings were also generally within normal limits showing good attention and concentration, intact memory, and normal thought content. (Exhibit 3F, page 1S7-178)
>
> Although records show ongoing reports of mood swings, stress, irritability, and panic attacks, the claimant's complaints are

typically attributable to outside stressors such as caring for her children, her applications for disability benefits, or the deaths of loved ones.[3] (Exhibit 4F, 5F, 8F) In February 2014, the claimant requested to decrease the frequency of her sessions to once per month, and her psychologist agreed due to her "stability." (Exhibit 5F, page 17)

The undersigned has accounted for the claimant's manic episodes and panic attacks with limitations to unskilled work and only occasional contact with the public. **This degree of limitation is consistent with updated GAF scores ranging from 55-62. (Exhibit 3F, 147-1S8, 4F, 5F, 6F) To the extent these scores constitute an opinion, they are given some weight, as they indicate mild to moderate symptoms, which is consistent with the findings on mental status examination**, discussed above.

**Otherwise, the undersigned assigns little weight to the claimant's GAF of 50 during her 2009 hospitalization and scores ranging from 45-52 in the period immediately after she initiated psychological treatment. (Exhibit IF, 3F, page 184-236) These low scores were given before the alleged onset date or in the months after she initiated professional mental health treatment**.

Furthermore, the record shows an improvement of the claimant's condition through treatment. Because GAF scores offer only a mere snapshot of the claimant's functioning at the time of the exam, these scores are not indicative of the claimant's overall level of functioning throughout the period at issue.

\* \* \*

**The VA also evaluated the claimant's mental impairments in August 2013**. She was assessed with a mood disorder, not otherwise specified and a GAF of 62. Based on an in-person examination and review of records, the report concludes that the claimant has an occupational and social impairment with occasional decrease in work efficiency and intermittent periods

---

[3] For example, at her initial visit on March 13, 2013, the psychologist noted that her stressors included limited assistance with her 3-year old twins, a pending divorce, and a history of abuse during her marriage. (Tr. 521).

of inability to perform occupational tasks, although generally functioning satisfactorily with normal routine behavior, self-care, and conversation. Furthermore, cluster B features likely impact the claimant's ability to cope with stress and manage emotions, which leaves her more vulnerable to develop psychological difficulties during times of stress. (Exhibit 3F, page 86-88, 147-149)

**The undersigned also assigns great weight to this opinion, as it is also consistent with a significant reduction in skill and interaction.** Furthermore, to account for cluster B features, which impact the claimant's ability to handle stress, the claimant should only occasionally adapt to minimal changes in the work setting. This restriction is also consistent with Dr. Estock's finding that the claimant should be able to adapt to infrequent, well explained changes.

**Greater mental limitations are not warranted based on the medical evidence of record as a whole.** As noted above, the claimant's level of care is not what would be expected of someone with the degree of impairment alleged. After initiating routine mental health treatment in March 2013, her mood disorder was controlled conservatively with medication, and by February 2014, her treating psychologist agreed to decrease the frequency of her counseling from bi-weekly to monthly due to her stability. Otherwise, the claimant's activities of daily living are not consistent with a disabling mental impairment. She is the custodial parent for her five year old twins, one of which has special needs. She is independent in self-care, able to wash dishes, do laundry, clean the tub and take her children to the park and to play baseball.

(Tr. 25-27) (emphasis added).

Contrary to Denton's argument, the ALJ reviewed the reports from her primary treating physician (the VA clinicians) and accorded varying amounts of weight to those opinions based upon their consistency with the evidence as a whole. Accordingly, Denton's factual intimation that the ALJ only gave weight to Dr. Estock's opinion concerning her mental limitations is not factually accurate.

Citing *Dillard v. Astrue*, 834 F. Supp. 2d 1325 (S.D. Ala. 2011), Denton

argues that the ALJ was prohibited from relying upon the opinion of a non-examining, reviewing physician to support her RFC assessment and, instead, was required to rely upon an assessment by a treating or examining physician. (Doc. 13 at p. 12-13). However, Denton's interpretation of *Dillard* is inapplicable under the facts of this case. More recent cases in this district have held that "[i]n order to find that the ALJ's RFC assessment is supported by substantial evidence, … it is not necessary for the ALJ's assessment to be supported by the assessment of an examining or treating physician." *Jones v. Colvin*, CA 14-00247-C, 2015 WL 5737156, at *24 (S.D. Ala. Sept. 30, 2015), *quoted in Pettaway v. Colvin*, CA 15-0640-C, 2017 WL 62649, at *7 (S.D. Ala. Jan. 5, 2017. "To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has 'provide[d] a sufficient rationale to link' substantial record evidence 'to the legal conclusions reached.'" *Jones,* 2015 WL 5737156, at *23 (quoting *Ricks v. Astrue*, No. 3:10-cv-975-TEM, 2012 WL 1020428, at *9 (M.D. Fla. Mar. 27, 2012) (internal quotation marks and citations omitted)).

"After careful consideration of the entire record," the ALJ found that Denton has the RFC to perform light work with some additional limitations. (Tr. 23). The Court finds that the ALJ properly linked her RFC assessment to the evidence contained in the record, and therefore, her determination of Denton's RFC is supported by substantial evidence.

## C.  ALJ Erred in Finding that There Are Jobs Denton Can Perform Given Her Assigned RFC

Finally, Denton argues that the ALJ erred in finding that jobs exist in

significant numbers in the national economy that Denton can perform given her RFC, age, education, and work experience. Specifically, Denton argues that the opinion of the Vocational Expert (VE) who testified at the hearing concerning the jobs that she can perform conflicted with the Dictionary of Occupational Titles (DOT). (Doc. 13 at pp. 5-7).

The ALJ found that Denton had the capacity to perform light work with the following limitations:

> she can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. She should not work at unprotected heights, around hazardous machinery, or operate automotive equipment and should never climb ladders, ropes, or scaffolds. She should never reach overhead with the right upper extremity, but can occasionally push/pull arm controls with the right upper extremity and can occasionally handle with the dominant right hand. The claimant is able to understand and carry out detailed, but uninvolved, written or oral instructions involving a few concrete variables in or from standardized situations. She can tolerate occasional contact with the general public and can occasionally adapt to minimal changes in the work setting or routine. She is able to maintain attention and concentration for up to two hours at a time and can perform goal oriented work, rather than production pace work.

(Tr. 23).

Once a claimant proves that she cannot perform her past relevant work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given her impairments. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). When the claimant has non-exertional limitations or cannot perform a full range of work at a given level of exertion, "the Commissioner's preferred method of demonstrating that the claimant can perform other jobs is through the testimony of a VE." *Jones v. Apfel*,

190 F.3d 1224, 1229 (11th Cir. 1999). Here, the ALJ found that Denton could perform jobs in the light category, but with additional limitations. Therefore, in order to determine whether there were a significant number of jobs that Denton could perform with these limitations, the ALJ relied upon a VE. "In order for the testimony of a VE 'to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.'" *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002); *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999). Here, the ALJ gave the following hypothetical to the VE:

> I'd like for you to assume an individual that's the same age as Ms. Denton, has the same education, and same work background. This individual could perform a reduced range of light work. And by that I mean the individual would be unable to perform any overhead reaching on the right, could occasionally push and pull arm controls on the right, occasionally handle with the right dominant hand. The individual would be able to understand, to carry out detailed but uninvolved written or oral instructions involving a few concrete variables, in or from standardized situations. The individual could have occasional contact with the public. The individual could occasionally adjust to minimal changes in the work setting or routine. The individual could maintain attention and concentration for up to two hours at a time. And the individual could perform goal orientated work, but not production paced work.

(Tr. 54-55).

In response to this hypothetical, the VE identified available jobs of protective clothing issuer (DOT# 222.687-046), sandwich board carrier (DOT# 299.687-014), and school crossing guard (DOT# 371.567-010), all of which are light work with an SVP of 1 or 2. (Tr. 55-56). The second hypothetical posed to the VE was whether there would be jobs available with the following additional limitations: "the individual could occasionally stoop, kneel, crouch, crawl, and

climb ramps and stairs. The individual would be precluded from working at unprotected heights, climbing ladders – ropes, ladders, or scaffolding. The individual would be precluded from working around hazardous machinery and operating automotive equipment." (Tr. 56). The VE testified that the sandwich board carrier job and the school crossing guard job would still be available, as well as the job of school bus monitor (DOT# 372.667-042), which is light with an SVP of 2. (*Id*.). The VE further testified that his "testimony [was] consistent with the Dictionary of Occupational Titles and its companion publications." (Tr. 57).

At the August 15 hearing before this Court, Denton argued that the VE's testimony that his opinion was consistent with DOT was false. However, at the hearing before the ALJ, during which the VE in this case testified in person, Denton did not question the VE about any inconsistencies, did not offer any testimony to the contrary, and did not object to the opinion. Moreover, the law in the Eleventh Circuit is clear that, even if the VE's testimony conflicts with the DOT, "the VE's testimony 'trumps' the DOT … because the DOT 'is not the sole source of admissible information concerning jobs.'" *Jones*. 190 F.3d at 1229-30 (quoting *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994)). In *Miller v. Commissioner of Social Security,* 246 F. App'x 660, 662 (11th Cir. 2007), the Eleventh Circuit held that "[e]ven assuming that an inconsistency existed between the testimony of the vocational expert and the DOT, the ALJ did not err when, without first resolving the alleged conflict, he relied on the testimony of the vocational expert" because "[o]ur precedent establishes that the testimony of a vocational expert 'trumps' an inconsistent provision of the DOT in this Circuit."

Here, the VE opined that the ALJ's hypothetical person could perform the three jobs described above. This Court finds that the ALJ did not err by relying on the VE's testimony and that the VE's testimony as to the existence of work in the national economy that Denton could perform with her impairments is substantial evidence supporting the ALJ's finding. S*ee Jones v. Comm'r of Soc. Sec.*, 423 F. App'x 936, 939 (11th Cir. 2011).

## **CONCLUSION**

As noted above, it is not this Court's place to reweigh the evidence or substitute its judgment for that of the Commissioner. It is well-established that this Court is limited to a determination of whether the ALJ's decision is supported by substantial evidence and based on proper legal standards. The Court finds that the ALJ's Decision that Denton is not entitled to benefits is supported by substantial evidence and based on proper legal standards. Accordingly, it is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff benefits be **AFFIRMED**.

**DONE** and **ORDERED** this the **24**[th] day of **August, 2017**.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**